# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### April 19, 2016 Session

## STATE OF TENNESSEE v. RODNEY EARL JONES

**Appeal from the Criminal Court for Davidson County**
**No. 2012-C-2035      J. Randall Wyatt, Jr., Judge**

_____

**No. M2015-01373-CCA-R3-CD – Filed December 6, 2016**

_____

A Davidson County jury convicted the Defendant, Rodney Earl Jones, of first degree felony murder and especially aggravated robbery. The trial court sentenced him to life for the first degree murder conviction and to twenty years for the especially aggravated robbery conviction, ordering the sentences to be served consecutively. On appeal, the Defendant contends that: (1) the trial court erred when it denied his motion for severance; (2) the trial court erred when it failed to instruct the jury about his co-defendant's out of court statements; and (3) the evidence is insufficient to sustain his convictions. After review, we affirm the Defendant's convictions.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

G. Jeff Cherry and Christopher Beauchamp, Lebanon, Tennessee, for the appellant, Rodney Earl Jones.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Glenn R. Funk, District Attorney General; and Brian Ewald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the murder of the victim, Victor M. Parham, which occurred on or about March 14, 2012. For this murder, a Davidson County grand jury indicted the Defendant and two co-defendants, Alberto Conde-Valentino and Xavier Tull-Morales, for the first degree felony murder and especially aggravated robbery of Victor M.

Parham. The Defendant filed a motion to sever, which the trial court denied. At the Defendant's trial on these charges, the parties presented the following evidence: Carlos Burroughs testified through an interpreter that he was incarcerated serving a sentence for DUI at the time of the trial. Mr. Burroughs said that he and the victim had been friends since the third grade and that they were like brothers. The two, who had been roommates for several years, spoke by telephone every day and saw each other frequently. Mr. Burroughs stated that he and the victim lived together at a residence on Allen Road ("Allen Road Residence") in Donelson, Tennessee. Mr. Burroughs eventually moved out, and the victim remained living at the Allen Road Residence.

Mr. Burroughs described the victim, saying that he was good with his family and never had a problem with anyone. Mr. Burroughs knew the victim's girlfriend, Starnesha Grant, and his brother, Darius Parham. Mr. Burroughs said the victim owned a lawn care service. Mr. Burroughs said that the victim never discussed selling drugs, and Mr. Burroughs was not aware that the victim engaged in this activity.

Mr. Burroughs testified that he called the victim around 12:00 p.m. on his last day of DUI class. The two spoke on the telephone, laughing, and the victim said that he had to go to his house. When Mr. Burroughs got out of his class late that evening, he again tried to call the victim. When the victim did not answer either of his phones, which was unusual, Mr. Burroughs began calling other people to determine the victim's whereabouts. Mr. Burroughs said that he called the victim's girlfriend, Ms. Grant, who at first seemed unconcerned. She called him back and inexplicably said that she did not want to go to the Allen Road Residence alone. She came and picked up Mr. Burroughs, and the two of them went to the Allen Road Residence together at around 8:00 or 9:00 p.m. Mr. Burroughs recalled that, when Ms. Grant picked him up, she was driving the victim's car, which was not unusual.

Mr. Burroughs said that he looked around the victim's home, finding all the doors locked and the lights off. Ms. Grant's car, which the victim often drove, was parked in the driveway. Mr. Burroughs said that Ms. Grant seemed "nervous" and repeatedly asked him to break into the home. Mr. Burroughs declined and suggested they contact the victim's brother, Mr. Parham, who lived with the victim at the time. Mr. Burroughs said that he assumed that the victim was with a friend, and the idea that he was dead never occurred to him.

Mr. Burroughs said that he returned home, wanting to contact Mr. Parham before entering the residence. He asked Ms. Grant to keep him apprised of any developments. Ms. Grant and Mr. Parham contacted him the next morning, and he went back to the Allen Road Residence, where police were investigating a crime scene. Mr. Burroughs said that he stayed at the residence until police removed the victim's body from the scene.

2

Mr. Burroughs said that, a few weeks later, he and several of the victim's friends and family were back at the Allen Road Residence cleaning. The victim's cousin found a bullet on the floor, and they called the police. The police asked several questions with regard to the bullet.

During cross-examination, Mr. Burroughs testified that when the bullet was found the group left it on the floor untouched. During further cross-examination, Mr. Burroughs agreed the victim had two phones, explaining that one was a work phone and the other a personal phone.

During redirect examination, Mr. Burroughs testified that, after Ms. Grant dropped him off that evening before victim's body was found, she called him later to ask him whether he thought the victim would mind if Ms. Grant allowed Mr. Parham to sleep at her residence that evening. She wanted to know whether Mr. Burroughs thought that this would make the victim angry. Mr. Burroughs told her that he thought it was fine.

Starnesha Grant testified that she was a twenty-eight year old grievance analyst for CVS pharmacy. At the time of these events, Ms. Grant attended Cumberland University as a nursing student and also cared for her daughter, who was seven at the time. Ms. Grant recalled that she and the victim had dated for three years at the time of his death. Ms. Grant said that the victim owned several vehicles, one was a work truck and the others were personal cars. She said that she often drove the victim's two-door car, and he drove her four-door car because they liked each other's cars better.

Ms. Grant acknowledged that the victim sold drugs. She said that he sold marijuana, prescription pills, and ecstasy. Ms. Grant said that the victim had cash on-hand at all times, sometimes in large amounts. Ms. Grant said that, if the victim carried this money with him, he would place it in different locations on his person. For example, he would store some of the cash in his shoes and some in his pockets. In this way, the victim attempted to avoid detection as a drug dealer if stopped by police. Ms. Grant said that when the police first questioned her about the victim's drug dealing she did not answer honestly and denied that the victim sold drugs.

Ms. Grant confirmed that Mr. Burroughs and the victim were as close as brothers. She said that the two contacted each other daily. She also recalled meeting the victim's brother, Mr. Parham, after Mr. Parham was released from jail a few months before the victim's murder. Ms. Grant said that Mr. Parham was living in the victim's Allen Road Residence, which was the reason that the victim still rented the residence. The victim had obtained an apartment nearby but kept the Allen Road Residence for Mr. Parham.

3

Ms. Grant said that there was only one key to the Allen Road Residence because she had broken the spare key. She said that this sometimes posed a problem because the victim insisted on keeping the only key, so Mr. Parham was sometimes locked out of the residence. Ms. Grant said that the victim had two phones, one of which she had recently purchased for him as a Valentine's Day gift. Ms. Grant said that, routinely, the victim immediately responded to her calls if he did not answer, either by calling her back or responding by text.

Ms. Grant said that she knew the Defendant because the Defendant had previously lived with the victim. Ms. Grant recounted that the Defendant and the victim lived together before she and the victim began dating, but the victim had introduced her to the Defendant on several occasions. Ms. Grant said the victim could not drive because of his multiple DUI convictions, so she sometimes drove the victim places. She said she drove him to the Defendant's house "a couple of times."

Ms. Grant recalled the events surrounding her finding the victim dead. She said that the victim had spent the night with her, and the two awoke together on March 14, 2012. Ms. Grant awoke at 8:00 a.m. because she had to go to work, and the victim returned to sleep in her bed. When she arrived at work, her outfit did not meet the dress code, so she returned home to change. When she arrived home briefly to change, she found the victim still asleep in bed. Ms. Grant said that she went to work and did not speak with the victim all day. After work, but before her night class, she went to the Allen Road Residence. Ms. Grant, who was driving the victim's black car, saw her white car, which he sometimes drove, parked and unlocked at the residence. She found this unusual. She assumed this meant that the victim had just run into his house for a minute and intended to return quickly. Ms. Grant smoked some marijuana and texted the victim to tell him that she was in the driveway. She then placed the remainder of her marijuana in the trunk of the white car.

Ms. Grant said that, when the victim did not text her back, she became concerned. She knocked on the door and looked around the house. After seeing nothing, she decided to leave and go to her class. As she was leaving, she thought she saw something in the window and went again and knocked on the door. Getting no response, Ms. Grant left and went to her class. Ms. Grant said that she and the victim's brother Mr. Parham texted each other during her class, and he asked her whereabouts. She left her class at 8:30 p.m., retrieved her daughter, and then went back to the Allen Road Residence. There, she retrieved the marijuana from the trunk of the white car, finding it strange that there were no lights on in the house and that the white car was still unlocked. Ms. Grant said that, because she had her daughter with her, she did not knock on the doors of the residence because she needed to get her daughter home and in bed.

4

Ms. Grant recalled that, when she arrived home, she started repeatedly calling the victim. When she did not get an answer, she started calling the local jails, the hospitals, and the victim's friends. Ms. Grant said she asked her neighbors to watch her sleeping daughter, and she asked Mr. Burroughs to go with her to the victim's house. She said that the two checked the house, again finding no answer, and she asked Mr. Burroughs to break a window. He declined, saying that the victim would be upset about the broken window. The two then left the residence.

Ms. Grant testified that she drove Mr. Burroughs back to his residence while continuing to attempt to contact the victim's brother and friends. She spoke with Mr. Parham, who also seemed concerned about the victim's welfare. He informed her that, because the Allen Road Residence was locked, he did not have anywhere to stay the night. He asked to stay at her apartment. Ms. Grant called Mr. Burroughs because the victim had previously expressed concern about Mr. Parham staying at her apartment. Mr. Burroughs agreed that the victim would approve, so she allowed Mr. Parham to stay with her.

The following morning, March 15, 2012, the victim's mother contacted her and asked if she had spoken with the victim, and she informed the victim's mother that she had not. Ms. Grant and Mr. Parham dropped off her daughter at daycare at 6:00 a.m. and went to the victim's house. Mr. Parham "popped a lock" on the door, and the two entered the house. They immediately saw the victim lying on his stomach on the floor. They also saw a knife on the floor, so she thought someone had stabbed the victim. Ms. Grant said that she turned the victim over and attempted to resuscitate him, believing that she could save him. Mr. Parham called 911. She at some point spoke with the operator and expressed that she was a nursing student and attempting to save the victim.

Ms. Grant recalled that both she and Mr. Parham felt devastated by finding the victim dead. At one point, Mr. Parham, who was crying, punched a hole in one of the walls. When the emergency responders arrived, they asked Ms. Grant and Mr. Parham to wait outside. Ms. Grant recalled crying and being upset. The victim's mother arrived. The police also arrived, and a police officer transported Ms. Grant to the police station where she provided a statement. Ms. Grant said that she consented to the police searching her home and car and to swabbing her hands for gunshot residue. The police took the phones that she had in the black car. On the day of the victim's funeral, Ms. Grant deleted text messages from her personal cell phone that related to drug dealing activities. She said that she did this because she did not want to lose custody of her daughter.

During cross-examination, Ms. Grant testified that she knew that there was a surveillance system at the Allen Road Residence, and she knew how to turn it on and off.

5

She believed that it recorded to a VHS tape. She denied taking the tape out of the surveillance system, saying that she did not go upstairs in the residence that day. Ms. Grant agreed that she knew that drug deals occurred at the Allen Road Residence, but she denied participating in any of those. She said she participated in other drug deals. She said that she "exchanged money for drugs" but denied that she was a "drug dealer." During further cross-examination, Ms. Grant testified that she had no explanation for why her phone and the victim's phone were "pinging from the same address" after she found his body. She agreed that she initially declined to give the police her phone because it was her only method of communication. She said that a police officer saw her delete a text message about selling five Lortabs. The officer then took the phone from her.

Ms. Grant testified that the victim owned an AK47 assault rifle or some other type of rifle. He also owned another weapon, but she was unsure of the make or model of it. He routinely kept those weapons at the Allen Road Residence. She said that the victim did not keep his weapons at her home but that police found a box of .380 ammunition at her house, which she said belonged to the victim. Ms. Grant said that the victim was a convicted felon, so she sometimes purchased ammunition for him.

Darius Parham testified that the victim was his older brother. Mr. Parham said that he moved into the Allen Road Residence almost two weeks before the victim died. The two planned to move, so the victim never made Mr. Parham a key for the residence. Mr. Parham recalled that the victim had a surveillance camera, explaining that the victim's room was far from the front door, and the camera enabled him to see who had arrived at the residence. Mr. Parham recalled that the victim was very close with Mr. Burroughs, saying that the two spoke regularly.

Mr. Parham said that, the day before the victim died, Mr. Parham was away from the residence and, when he returned, he called the victim to let him into the Allen Road Residence. The victim did not answer his phone and did not call him back, which was unusual. Eventually Mr. Parham contacted Ms. Grant, and he spoke with Mr. Burroughs, both of whom had not heard from the victim.

Mr. Parham testified that he did not have anywhere to stay the night before he found the victim's body, so he asked Ms. Grant if he could stay at her residence for the night. She agreed, and he went to her home late that evening. Mr. Parham recalled that Ms. Grant told him that she had called the local jails and the hospital looking for the victim. Mr. Parham slept in the living room.

Mr. Parham said that, when he awoke the next morning, he and Ms. Grant took her daughter to daycare, and then she went to the Allen Road Residence. He said that he used his identification card to open the lock of the door, and he immediately saw a knife

on the floor. Thinking the victim had been stabbed, Mr. Parham flipped the victim over. Mr. Parham said that he knew that the victim was dead because he was "too hard" to be alive. Mr. Parham said Ms. Grant tried to resuscitate the victim, but he knew that it was too late. He called 911, and he said he had listened to the 911 recording, upon which he and Ms. Grant sounded upset. Mr. Parham said that because he was so upset over his brother's death, he punched a hole in one of the walls. Mr. Parham said that police officers questioned him, took his fingerprints, and tested his hands for gunshot residue.

Mr. Parham recalled that, a couple of weeks later when he and some other relatives and friends were cleaning the victim's house, he found a bullet on the floor where the victim's body had been lying. He said that they called the police, who responded and took pictures.

During cross-examination, Mr. Parham testified that he was not aware that the victim sold drugs from the residence, believing that this activity was in his past. He said that several people had access to the residence during the time between the victim's death and the time they found the bullet. This included the property owner, his mother, his uncle, and himself. On redirect, Mr. Parham agreed that he "maybe" stated, "some bitch must have done this." He explained that he believed that the victim suffered a stab wound and that only a woman would stab someone.

Iris Pinson testified that she did not want and was scared to testify. Ms. Pinson recalled that, at the time of the victim's death, she lived in a housing project in Davidson County. A man named Xavier Tull-Morales, a codefendant in this case, resided in a home behind Ms. Pinson's home in a housing project. She recalled that the two became acquainted and eventually became friends, seeing each other daily. Their relationship was not a romantic one, but she got the impression that he was romantically interested in her. Through co-defendant Tull-Morales, Ms. Pinson met the Defendant and co-defendant Conde-Valentino.

Ms. Pinson testified that co-defendants Tull-Morales and Conde-Valentino were frequently together. Co-defendant Conde-Valentino came to co-defendant Tull-Morales's home every day and sometimes stayed there for days at a time. Co-defendant Conde-Valentino's residence was in Dodge City, where he lived with his mother. Ms. Pinson said, however, that co-defendant Conde-Valentino came to the neighborhood frequently because his girlfriend also lived in their development.

Ms. Pinson said that the two co-defendants would sometimes come to her home, which she shared with her two children and her fifteen-year-old sister, of whom she had custody. They also engaged in social activities together, but Ms. Pinson never went to co-defendant Tull-Morales's home because his older sister, Kathy, who lived with him

7

did not like Ms. Pinson. Co-defendants Tull-Morales and Conde-Valentino told her that they were cousins.

Ms. Pinson said that she also met the Defendant through co-defendant Tull-Morales because the Defendant and co-defendant Tull Morales were friends. Ms. Pinson's friend, Patri, who was also related to co-defendants Tull-Morales and Conde-Valentino, dated the Defendant. When Patri visited Ms. Pinson, the Defendant came to see her there on several occasions. Ms. Pinson knew the Defendant, who spoke fluent Spanish and drove a black SUV.

Ms. Pinson recalled a day in March 2012 when the three men came to her home. The Defendant drove there and approached her back porch on foot. The other two co-defendants walked toward her back porch also. At the time, co-defendant Tull-Morales began bragging that he was going to "rob somebody." Ms. Pinson did not take this statement seriously because co-defendant Tull-Morales had made similar statements in the past, as had the other men, but never carried through with them. Ms. Pinson said she had seen co-defendant Tull-Morales rob someone in the past, but he used a water gun and did not hurt the victim.

Ms. Pinson said that both co-defendant Conde-Valentino and the Defendant were present when co-defendant Tull-Morales made his statement. She also said that co-defendant Conde-Valentino made similar statements at the time about robbing someone. The Defendant stated that they could get drugs and money from the robbery. Ms. Pinson said that none of the men discussed the intended victim or location of the crime. She did not see a weapon in their possession until the men got into the Defendant's car, at which time she saw the Defendant and co-defendant Conde-Valentino each with a weapon. Ms. Pinson said that, while co-defendant Tull-Morales said that he had a weapon, he was unarmed.

Ms. Pinson said that she did not see the three men again until dark that night. The three men came to her home, and she noted that co-defendant Tull-Morales had a lot of blood on his hands and shirt. He changed his shirt at her home. Ms. Pinson also saw that co-defendant Tull-Morales was carrying two baggies that she thought contained drugs; one baggie appeared to contain cocaine and the other appeared to contain pills. He also had "a lot of money" with him. Co-defendant Conde-Valentino also had a similar amount of blood on his shirt and hands as co-defendant Tull-Morales, and he also changed his shirt. Ms. Pinson said that, when the two men were upstairs changing, she saw them use the drugs that they had in their possession. Ms. Pinson said that the Defendant did not use the drugs. She also recalled that he only had a small smear of blood on his hand and none on his shirt.

8

Ms. Pinson testified that, when both co-defendants removed their shirts, they placed them in a grocery plastic bag, which they gave to the Defendant. The Defendant left her home with the bag.

Ms. Pinson testified that co-defendant Tull-Morales told her what had happened. He said that he had waited in the car for a long time and then went up to the residence, knocked on the door, and said he had to go to the bathroom. The occupant of the home let him enter, he walked past the man, and then he shot him. Ms. Pinson said co-defendant Tull-Morales said that "he blew his face off." He made these statements, she said, in the presence of the other two defendants. Ms. Pinson noted that co-defendant Tull-Morales seemed "very messed up off drugs" at the time he made these statements. His words were slurred but he did not seem tired.

Ms. Pinson said that co-defendant Conde-Valentino said that he stabbed the robbery victim and had "unloaded" on him. He made this statement in the presence of both co-defendants. Ms. Pinson confirmed that co-defendant Conde-Valentino was "shaky," "nervous," and that he kept saying that he was going to go to jail. Co-defendant Conde-Valentino then threw up multiple times. Ms. Pinson said that the two co-defendants began arguing, and the Defendant seemed like he did not know what either of them was talking about. Ms. Pinson took from their conversation that the men had already divided up the proceeds of the robbery but that co-defendants Conde-Valentino and Tull-Morales were both upset because they felt their portion was unfair.

Ms. Pinson said that the Defendant told her to keep her "mouth shut" about what she had heard in her apartment. Other than that, he "pretended like nothing had happened."

Ms. Pinson said she asked the men to leave, saying that her kids were asleep. She said she "got them out as fast as [she] could." She said she did not receive any drugs or money from them. The men also were no longer in possession of the weapons she had seen them with earlier. Ms. Pinson testified that she did not call the police because she was scared that she or her children would be hurt.

Ms. Pinson recalled that, a couple of weeks later, she, her sister, and co-defendant Tull-Morales were watching the news on television. A photograph of the Allen Road Residence surrounded by police tape appeared on the screen during the news story, and Ms. Pinson realized that she recognized the residence and had been there before. The report then showed a photograph of the victim, and Ms. Pinson realized that she knew the victim of the robbery. Ms. Pinson told co-defendant Tull-Morales that she knew the victim, and he apologized to her. Ms. Pinson said that before the news story she did not know where their robbery had occurred or whom they had killed.

9

Ms. Pinson said that she knew the victim as "Vic" and that she had met him almost two years before because he was friends with her sister's boyfriend. She had not seen him in the seven months before his death. She said that they had "hung out a couple of times" with her sister and her boyfriend. She said she knew the victim sold drugs, and she had purchased marijuana from him in the past. Ms. Pinson also had heard that the victim sold "pills," but the victim did not discuss his business around her.

Ms. Pinson recalled that, after the robbery, co-defendant Tull-Morales repeatedly told her how he had killed the victim. He told her that there were "pieces of his hair and stuff all over the place." She said that, after the initial night that the men came to her home, co-defendant Conde-Valentino did not speak about the robbery with her. He told her he was scared that he would go to jail, but he did not mention the substance of the crime. After the night of the robbery, she did not interact at all with the Defendant as the Defendant "disappeared from the projects after it happened."

Ms. Pinson said that, a couple of weeks after the murder, a number of police officers "raided" her home. She said that she lied to police, telling them that co-defendant Tull-Morales was in California even though he was still living behind her. She told them that she did not know anything about the crimes. They left a telephone number for her to contact if she remembered anything relevant.

Ms. Pinson testified that co-defendant Tull-Morales told her that he was going to leave town. He explained that he did not want to go back to prison. He told her that "Patri" and "Louie" were going to drive him to Florida. When she saw co-defendant Tull-Morales leave, it appeared as if the Defendant was driving him and that Patri and Louie were in the car. Ms. Pinson said that she was upset to see co-defendant Tull-Morales leave. After he left, she still saw co-defendant Conde-Valentino around the housing project, but she did not see the Defendant again. Ms. Pinson said that she later learned that co-defendant Tull-Morales was in Zephyrhills, Florida, when he contacted her via Facebook. The two also spoke by telephone.

Ms. Pinson said that, after co-defendant Tull-Morales left town, she contacted the police. She explained that she had known the victim and felt "horrible" and as if she could not "live with [herself]" if she did not tell the truth. She gave the police the entire story and told them that co-defendant Tull-Morales still contacted her via phone. She attempted to do a "controlled call" in their presence but was unable to reach co-defendant Tull-Morales. The police gave her recording equipment, and she recorded one of their later conversations, during which she was able to elicit statements from co-defendant Tull-Morales about this incident.

Ms. Pinson agreed that it was difficult to understanding the recording. She said, however, that in response to her question about whether co-defendant Tull-Morales shot the victim, he said that he knocked on the door, said he had to go to the bathroom, walked inside the home, and shot the victim. He also said that he shot the "mother f**ker in the face." Ms. Pinson agreed that she led co-defendant Tull-Morales on during the conversation, telling him that she loved him and that she wanted him to come back and be with her. She referenced prior conversations about a daughter that the two wished to have in order to induce him to meet her in Knoxville, Tennessee, where the police apprehended him.

During cross-examination by the Defendant's attorney, Ms. Pinson testified that she never sold marijuana or prescription pills to the victim but that she had sold prescription pills in the past. She said, however, that she had a "pill problem" at the time of the robbery, so she was purchasing pills and not selling them. She maintained that she never used any of the pills that the defendants brought to her home after the robbery. She said that she purchased her pills from the victim instead. She said that, from the amount of blood on the defendants, she assumed there would have been blood in the Defendant's car. Ms. Pinson said that she had heard that the victim made a lot of money from selling drugs.

During cross-examination by co-defendant Tull-Morales's attorney, Ms. Pinson testified that co-defendant Tull-Morales did not have much money at the time of the robbery or after. She said in her phone call to him that she offered to send him money to purchase a phone. Ms. Pinson said that many men in the "projects" brag about doing criminal activity that they do not actually commit. She said "[e]verybody thinks they are a thug or a gangster." She said the only way she knew whether co-defendant Tull-Morales committed this crime was through his own statements. She agreed that the victim's face was not "blown off," so co-defendant Tull-Morales at least lied about that fact. Ms. Pinson said that the defendants bragged about what they had done to multiple people in the projects.

During cross-examination by co-defendant Conde-Valentino's attorney, Ms. Pinson said that if she omitted telling police about seeing some of the defendants with weapons it was because she was "scared to death" at the time of her interview. She said she told police that the defendants returned with $10,000. She said that they had "a lot" of money and that they told her it was $10,000.

The State then presented the testimony of several law enforcement officers from the Metropolitan Nashville Police Department who described the crime and investigation identifying the suspects. Police officers responded to a call about a stabbing at the Allen Road Residence on March 15, 2012, at around 8:00 a.m. When Officer Larry Benz and

Officer Daniel Crockett arrived, Mr. Parham waved them toward the residence. Officer Crockett stayed outside with Mr. Parham while Officer Benz went inside where he observed Ms. Grant performing CPR upon the victim's body. Officers described both Ms. Grant and Mr. Parham as "hysterical." Officer Benz asked Ms. Grant to cease CPR, reassuring her that paramedics were on their way. Officer Benz called for assistance and secured the crime scene. Mr. Parham and Ms. Grant provided statements to Officer Crockett at the scene about how they were related to and knew the victim and the story of how they found the victim.

When officers entered the home, they found the victim's body partially against the front door, making it hard to get into the door. In searching the crime scene, Officer Johnny Lawrence found a total of five .380 shell casings, three on the floor near the victim and one behind the couch. The victim had on only one blue and white tennis shoe, and the other matching shoe was lying on the floor nearby. An officer found a knife, upon which there was no blood or human matter, in the hallway between the living room and the kitchen area. There was a bloodstain on the closet door near the knife, which an officer swabbed for DNA testing. Special Agent Chad Johnson tested the DNA collected from various locations at the crime scene, and determined that the DNA swab taken from the hallway door of the crime scene matched the DNA of co-defendant Alberto Conde-Valentino. Officer Jeb Johnston saw some damage to the drywall in the house. Officer Johnston also found a closed-circuit camera monitoring system in one of the upstairs bedrooms. Officers never recovered a tape from the system.

When Detective Andrew Injaychock arrived at the scene, the medical examiner was examining the victim's body. The detective walked through the crime scene and then he interviewed Ms. Grant and Mr. Parham, both of whom he found cooperative. Mr. Burroughs arrived later, and Detective Injaychock also interviewed him. All three individuals provided the detective with the victim's cell phone number and their own cell phone numbers. Ms. Grant told him that she attempted to "clone" the victim's phone, and the detective said that there was also information that the victim had additional girlfriends. The detective said that, when looking at Ms. Grant's phone, he noticed that she had deleted texts. For several reasons, including these, Ms. Grant initially became the focus of his investigation.

Officer Lawrence performed Gunshot Residue Tests on both Ms. Grant and Mr. Parham. Officers sent these tests to the TBI for testing, and Special Agent Robert Miles testified that neither revealed the presence of any gunshot residue. Special Agent Robert Miles testified that these results could be because Ms. Grant and Mr. Parham had not fired a weapon or because they washed their hands after firing a weapon.

Officer Lynette Mace photographed the crime scene, and she identified those photographs for the jury. Officer Mace photographed the exterior and interior of the Allen Road Residence, Mr. Parham and Ms. Grant, and the victim's body. Officers agreed that the scene around the victim's body was not a large, bloody crime scene. While photographing Mr. Parham, Officer Lawrence discovered that Mr. Parham had both of the victim's cell phones in his possession. She also photographed a cooler located upstairs in which there was a shoebox containing $251 and a baggie of an unknown substance she believed to be drugs. Detective Injaychock determined the substance was crushed Ecstasy pills. Officer Lawrence photographed the knife block from which it appeared that a knife was missing. Officers were able to recover some fingerprints from the crime scene. Detective Injaychock said, however, all of the usable fingerprints recovered belonged either to the victim or to Mr. Parham, who was living in the home at the time.

Among other things, from the crime scene, officers collected two firearm magazines, several rounds of ammunition, spent cartridge casings, Hydrocodone, a white shirt, a Samsung cell phone, glass from the table, a mug, some candy wrappers, business cards, keys with a remote, a thumb drive, cigarette butts, and a baggie with the substance.

Officer Tommy Simpkins processed the two vehicles in front of the Allen Road Residence. Officer Simpkins gathered evidence from the black Toyota, which included one pill bottle containing forty blue pills and another bottle containing twenty-four blue speckled pills. From the white Pontiac, Officer Simpkins collected thirty-seven whole pills and thirteen half pills. Officer John Nicholson supervised the other officers gathering evidence, and he assisted in gathering evidence. He looked in trash cans located outside the residence. He found a $100 American Express gift card and a shell casing on the ground along the grassy part of the driveway. The shell casing was from a 9mm gun and appeared similar but different from the five shell casings found inside the Allen Road Residence.

On March 29, 2012, Officer Charles Linville went to the Allen Road Residence and used a metal detector to search the backyard. He did not find anything of investigative value. On March 31, 2012, Mr. Parham informed police that, when the family moved items out of the home, they saw a projectile. Detective Injaychock went and gathered the projectile, noting that it was located down in some kind of a hard surface close to the front door where they found the victim's body.

Detective Injaychock executed a search warrant at Ms. Grant's home, looking for the victim's phone, a weapon, and to obtain Ms. Grant's DNA. To execute the warrant, he followed Ms. Grant from the victim's funeral to her apartment, where Ms. Grant also provided consent to search the residence. The detective said that he did not find the

13

victim's phone or a weapon but that he did find some live unspent .380 ammunition in the residence. During the search, Detective Injaychock informed Ms. Grant that he suspected her of committing this crime and that he intended to confiscate her phone. She became upset and started manipulating data on her phone, deleting items. The detective said that he forcibly took Ms. Grant's phone. When officers analyzed the phone, nothing on it indicated that she participated in the victim's murder. He, however, did not know what she had deleted from the phone.

Detective Injaychock said that he received a tip about some "male Hispanics" who could have committed these crimes. Based upon this tip, he and other offers went to a local housing project and interviewed Ms. Pinson. The detective found Ms. Pinson uncooperative, and she did not give officers very much information.

Detective Injaychock examined the victim's phone records and found that the phone that placed a call to the victim's phone shortly before his death was registered to a woman who lived on Lake Drive. While the detective was following this lead, Ms. Pinson contacted police and gave her version of the events. Armed with this information, Detective Injaychock determined that the woman who lived on Lake Drive and to whom the phone was registered was the Defendant's mother-in-law. Analyzing the phone records, it appeared that this phone contacted the victim's phone several times a day leading up to his death and then never again after the phone call placed shortly before his death. Detective Injaychock determined that, at the time of the last phone call, the Defendant's phone was "pinging off" a tower that was almost in front of the Allen Road Residence.

Under the direction of Detective Injaychock, Detective Jason Moyer gathered several days of surveillance video from a barbecue restaurant and a denture business both of which were located near the Allen Road Residence. He found nothing of value from the denture business video but, in the video footage from the restaurant, he saw a black SUV, with a stripe similar to the stripe on the Defendant's vehicle, passing the restaurant at 11:56 a.m. and again at 1:39 p.m. Detective Moyer said that the video did not show the license plate of the vehicle or who was operating the vehicle.

Detective Injaychock said that, based upon Ms. Pinson's statement, the surveillance video, and the Defendant's Facebook posts, he went to the Defendant's address on Winwood Place looking for a black GMC Yukon. Detective Injaychock noted that time data showed that, at the same time that the barbecue restaurant surveillance video showed the black SUV driving past the restaurant, the phone associated with the Defendant was using cell towers located near the Allen Road Residence.

14

On May 20, 2012, Detective Injaychock went to the address associated with the Defendant's wife, Ms. Meklit Melke, on Windwood Place, where he believed that the Defendant also resided. He saw an SUV that appeared to match the one in the surveillance video, noting that both vehicles had trim across the door panel. The tires of the vehicle were flat. Officers towed the Defendant's GMC Yukon, which was registered to Ms. Melke, into custody. They contacted Ms. Melke, who gave consent for the officers to search the vehicle. Officer Linville assisted in processing the vehicle, and he said officers gathered fingerprints from the vehicle and photographed it. They conducted a presumptive blood test, looking for the presence of blood. All the spots tested negative. Officer Linville conducted a presumptive blood test on the knife found at the Allen Road Residence, which tested negative for the presence of blood. Detective Injaychock testified that all of the usable fingerprints found in the Yukon belonged to Ms. Melke, the Defendant, or their son. He further testified that none of the DNA swabbings taken from the GMC Yukon showed anything of investigative value.

The medical examiner provided the police with the victim's clothing, fingernail clippings, projectiles the medical examiner recovered from the victim's body, and a DNA swab of blood from the victim's wrist. Detective Injaychock sent much of this evidence to the Tennessee Bureau of Investigations ("TBI") for testing. Special Agent Alex Brodhag testified that testing showed that all five of the .380 recovered cartridge cases matched. He noted that the cases found at the scene were of a different brand than those found in Ms. Grant's home. Special Agent Brodhag determined that the five bullets police recovered, four from the victim's body and the one found at his home, had all been fired by the same weapon.

Detective Injaychock testified that, following up on the initial tip that led them to Ms. Pinson, he attempted to contact co-defendant Conde-Valentino at his house in North Nashville. Co-defendant Conde-Valentino spoke to the officers in Spanish. The detective determined that, because of the language barrier, he needed to return later with another officer who could interpret. When he returned, upon questioning, co-defendant Conde-Valentino said that he knew both the Defendant and co-defendant Tull-Morale as "acquaintances" but that he did not "hang out" with them frequently. He told officers that he did not know the victim and had never been to the victim's home. At first, co-defendant Conde-Valentino denied ever being in the Defendant's vehicle but, upon further questioning, he said he might have been in the SUV.

Detective Injaychock spoke with the Defendant about this murder in June 2012. The Defendant told him that he and the victim were friends but that they did not "hang out" a lot. The Defendant said that the last time that he saw the victim was a few days before his death when they met at a Wal-Mart. The Defendant never definitively said whether he saw the victim on March 14, 2012. The Defendant denied any involvement in

15

the victim's murder. The Defendant agreed that he knew both the co-defendants from the housing project and said he was "kind of watching out for them." The Defendant denied ever taking co-defendant Tull-Morales to Florida.

All three attorneys for the defendants cross-examined Detective Injaychock. As relevant to this appeal, the detective testified that Ms. Grant was at the crime scene when he arrived. He further agreed that the victim was killed with .380 ammunition and that he found that size of ammunition in Ms. Grant's home. Police never recovered the victim's cell phone. This was true despite the fact that the victim's cell phone was still active and pinging off cell phone towers after the police were called to the crime scene. He further noted that Ms. Grant's cell phone and the victim's cell phone appeared to be traveling in tandem after the murder occurred. Detective Injaychock opined that this was perhaps because Ms. Grant had attempted to "clone" their phones through an app.

Detective Injaychock agreed that he had interviewed a witness who said that the victim told her that Ms. Grant was jealous of another woman. According to the witness, the victim recounted that Ms. Grant stabbed him but that he did not call the police.

The detective testified that the Winwood address was located less than a mile from the Allen Road Residence. He agreed that, therefore, the Defendant's cell phone would access similar cell towers when he was going to his own home. Detective Injaychock agreed that co-defendant Tull-Morales surrendered himself. He said that there was no fingerprint, DNA, or blood evidence that connected co-defendant Tull-Morales to the crime.

The detective agreed that Ms. Pinson's account of how much blood there was on the co-defendants after the murder did not comport with what he knew about the crime scene. Additionally, Ms. Pinson's statement that co-defendant Tull-Morales shot the victim in the face did not match the victim's actual injuries.

During the redirect examination of Detective Injaychock, he agreed that a conversation that he listened to between co-defendant Tull-Morales and Ms. Pinson also placed co-defendant Tull-Morales at the crime scene. He further agreed that Ms. Pinson relayed to him only information that she had received from the defendants and never claimed to have seen the crime occur, which accounted for some of the discrepancies in her story.

Dejyitnu Gabru testified that her daughter, Meklit Melke, dated the Defendant, and they had two children together. Ms. Gabru signed up for a Sprint family phone plan, and she identified the number associated with the Defendant. She said that she purchased this phone for one of her grandsons, the Defendant's son, and that she later learned that the

16

Defendant used this phone. Ms. Gabru confirmed that the Defendant drove Ms. Melke's GMC Yukon vehicle and that he lived in a house that Ms. Gabru owned on Winwood Place with Ms. Melke and their two sons. During cross-examination, Ms. Gabru testified that she learned from the police that the Defendant used the cell phone number she purchased for her grandson. She never saw the Defendant use this number.

Antwonie Jobe testified that he was facing federal drug charges at the time of this trial and that he had other prior felony drug-related convictions. Mr. Jobe testified that he hoped to receive a lesser sentence in exchange for his helpful, truthful testimony. The prosecutor of his case, however, had not made him any promises. Mr. Jobe said he did not want to testify against the Defendant and that he only decided to do so after he himself faced federal drug-related charges. Mr. Jobe said he had known the Defendant for about twenty years. The two grew up in the same neighborhood and were friends. They lost contact while Mr. Jobe was incarcerated but resumed their friendship in 2007 when he was released.

Mr. Jobe testified that the Defendant came to his home occasionally and that the two spoke by telephone frequently. Mr. Jobe identified the Defendant's phone number as being the same number Ms. Gabru had purchased for her grandson. Mr. Jobe, whose primary source of income was the distribution of marijuana and cocaine, also knew the victim. He had grown up with the victim, they were acquaintances, and Mr. Jobe knew that the victim sold marijuana and pills. He did not know the victim to sell cocaine. Mr. Jobe said that while he and the victim both sold drugs they were geographically located in different parts of Nashville and their businesses did not overlap.

Mr. Jobe said that, the day before the victim's murder, some time in the morning, the Defendant came to his home in a black GMC Yukon that the Defendant drove. The Defendant came to his home to retrieve some "gas money." Mr. Jobe said that this was not unusual and that there were a few people, whom he considered friends, that he would occasionally give $20 for gas. The Defendant had with him two men who the Defendant referred to as his "Little Gs." Mr. Jobe said that, because he was a drug dealer who had both money and drugs with him, he was concerned about the identity of these men. He was concerned both for his safety and because the Defendant had never brought anyone to his home before.

Mr. Jobe said that he walked up toward the SUV to see who was with the Defendant. When he looked inside the SUV, he saw co-defendant Tull-Morales and co-defendant Conde-Valentino. Mr. Jobe said, at the time, he realized he had previously seen the Defendant with these two men in a housing project in South Nashville on multiple occasions. Mr. Jobe said the two men stayed in the SUV while Mr. Jobe and the Defendant went inside the home. Mr. Jobe gave the Defendant a marijuana cigarette and

17

$20, and the Defendant told him that he and the two co-defendants were planning to "rob" the victim. This did not surprise Mr. Jobe because the Defendant had twice previously mentioned robbing the victim. He asked Mr. Jobe to participate, and Mr. Jobe declined.

Mr. Jobe said that the Defendant stated that he had sold pills to the victim in the past, acting as a middleman. The victim then sold the pills to the victim's customers. The Defendant told Mr. Jobe that he intended to set up a false deal and get $2,000 from the victim. Mr. Jobe said that he tried to talk the Defendant out of robbing the victim during their twenty to thirty minute conversation. Mr. Jobe said that he gave the Defendant extra marijuana and cocaine and told him to go home and "chill." The Defendant said that he was going to go home. Mr. Jobe believed that he had diffused the situation.

Mr. Jobe said that the Defendant called him later that evening at around 5:00 or 6:00 p.m. The Defendant, who seemed nervous and scared, told Mr. Jobe that the Defendant should have listened to Mr. Jobe because the victim might be dead. Mr. Jobe said that he watched the news and learned that the victim was dead. He drove and picked up the Defendant, who told him that the robbery had gone all wrong. The Defendant produced a small handgun and said he had to get rid of it. Mr. Jobe said the Defendant attempted to place the gun in Mr. Jobe's glove box, but Mr. Jobe told him that he could not. Mr. Jobe said that, at the time, they were driving on a bridge over a lake, and the Defendant then threw the gun into the lake. During their conversation, the Defendant told him that he had been to the victim's house the day before. The Defendant asked Mr. Jobe to be his alibi. He asked Mr. Jobe to say that the Defendant was working for Mr. Jobe's lawn care service on the day that the murder occurred. Mr. Jobe declined.

Mr. Jobe testified that, in subsequent conversations in the weeks that followed, the Defendant told Mr. Jobe that he was going to kill himself. He said that he was going to meet with two detectives, shoot one of them, forcing the other to shoot the Defendant. The Defendant said that he believed that co-defendant Tull-Morales had told his girlfriend about the crime, and Mr. Jobe understood the Defendant to be saying that he was going to attempt to kill co-defendant Tull-Morales. Mr. Jobe said that he told the Defendant not to kill co-defendant Tull-Morales and suggested that he instead take him out of town. A few days later, the Defendant called Mr. Jobe and informed him that he had done as Mr. Jobe suggested and taken co-defendant Tull-Morales to Florida.

During cross-examination, Mr. Jobe testified that violence was part of the drug trade, in which both he and the victim participated. He agreed that he did not know what type of gun he saw the Defendant with, describing it as "chrome" and a small caliber like

18

a .25, .32, or .380. Mr. Jobe agreed that he slowed down his car so that the Defendant could throw the weapon into the river.

Mr. Jobe testified that when the Defendant said he was planning to rob the victim the two co-defendants were not within earshot. He agreed that, the day before this murder, the Defendant called him a number of times. On the day of the murder, he and the Defendant spoke for the first time at 7:33 a.m. They then spoke again at 7:58 a.m., 8:19 a.m., 8:22 a.m., 8:31 a.m., 8:37 a.m., 8:40 a.m. There was a pause in their phone calls, and they spoke again at 11:08 a.m., and 11:46 a.m., 11:58 a.m., and 12:04 p.m., and 12:59 p.m. on the day of the murder. Mr. Jobe maintained that he did not know the dates of the murder but that he knew that he had seen on the news that the victim was dead before he drove the Defendant around and the Defendant threw out his weapon.

Andrew Vallee, a detective with the Metropolitan Nashville Police Department, testified that he participated in this investigation. He obtained the cell phone records for the victim, the Defendant, and Ms. Grant. He also ordered swabs for DNA be taken from the three defendants. The detective testified as an expert in cell phone analysis about the operation of cell phones in general.

Detective Vallee testified that the phone records for the phone belonging to the victim showed Ms. Grant listed in the subscriber information. Further, it showed that the victim called the Defendant at 10:04 a.m. and 10:15 a.m. on the day of his murder. The victim's last outgoing call on the day of his death occurred at 11:42 a.m. The phone records showed that the victim's phone was "no longer responding to the network" after 12:16 p.m. on the day of his death. He explained that this could mean any number of things, including that his cell phone was turned off, destroyed, or in a tunnel.

The detective said that the Defendant's phone listed the subscriber as Ms. Gabru. He noted that the antenna connections on the phone showed that it was located near I-40 and I-24 from 9:35 a.m. to 10:59 a.m. on the day of the murder. At 11:07 a.m., the phone was located next to the airport. The phone records then indicated the phone was in the Hermitage area at 11:44 a.m., and the Donelson area from 11:46 a.m. to 11:50 a.m. From 11:52 a.m. until almost 12:30 p.m. the cell phone used two towers, one 0.71 miles south of the crime scene and one 0.553 miles from the residence. At 12:16 p.m., the time of the final communication with the victim's phone, the Defendant's phone and the victim's phone were pinging off the same tower.

Detective Vallee testified that he analyzed the victim's and Ms. Grant's cell phone records to determine whether they were located in the same area at the time of this crime. The records were consistent with Ms. Grant's testimony that she went to the victim's house looking for him on multiple occasions.

During cross-examination, Detective Vallee testified that while the phone records indicated where the cell phones were at specific times, he had no idea who possessed the cell phones at that same time. The detective agreed that he did not analyze data from the phones of Ms. Pinson or Mr. Jobe. He also could not analyze data from the victim's phone because police officers never found that phone. Detective Vallee agreed that neither co-defendant Tull-Morales nor co-defendant Conde-Valentino owned a cell phone.

Johnny Ray Crumby, Jr., a detective with the Metropolitan Nashville Police Department, testified that he interviewed both the Defendant and co-defendant Conde-Valentino. Recordings of these interviews were introduced but were not played for the jury. During the interview, the Defendant said that he was using his son's phone at the time of the murder. Detective Crumby also identified a map of the area near the Allen Road Residence. During cross-examination, Detective Crumby agreed that he misled the defendants during his interview with them in an attempt to get them to tell him what had happened.

Thomas Deering, MD, testified as an expert in forensic pathology that he responded to the scene of this murder on March 15, 2012 with a group of investigators. He observed the victim's body, which personnel then brought to the Medical Examiner's Office for examination. Dr. Deering testified that the victim was twenty-eight years old at the time of his death. The doctor performed an autopsy on the victim's body and opined from the state of the victim's body that the victim had been killed the previous day. Dr. Deering testified that he found multiple injuries to the victim's body, including six different gunshot wounds. Four of the bullets that created those wounds were still in the victim's body. The most significant wound was one that entered the victim's left shoulder, traveled through his chest, and hit his right lung. That bullet hit a portion of the victim's aorta causing significant internal bleeding and remained there until removed by the doctor. This wound alone was fatal.

Dr. Deering explained that the amount of blood in the chest cavity explained the lack of blood at the crime scene. He said the blood flows to the area of least resistance and, therefore, after the perforation of the victim's aorta, the blood flowed into his chest cavity rather than outside of his body. He further opined that the wounds occurred in close temporal proximity and from a distance of greater than two feet. The doctor testified that multiple gunshot wounds caused the victim's death and that the manner of death was homicide.

During cross-examination, Dr. Deering agreed he did not find any stab wounds. The doctor agreed that there were six bullet wound tracks but that he only found four bullets. He said that the other two bullets must have been at the scene.

Based upon this evidence, the jury convicted the Defendant of aggravated robbery and first-degree felony murder. The trial court sentenced him to life for the first degree murder conviction and to twenty years for the especially aggravated robbery conviction, ordering that the sentences be served consecutively. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the trial court erred when it denied his motion for severance; (2) the trial court erred when it failed to instruct the jury about his co-defendant's out of court statements; (3) the evidence is insufficient to sustain his convictions.

### A. Motion for Severance
### 1. Motion Hearing

The Defendant first contends that the trial court erred when it denied his motion for severance. Co-defendant Conde Valentino also filed a pretrial motion for severance. In it, he contended that the co-defendant Tull-Morales and the Defendant may have made pretrial statements implicating him and that the State intended to use these statements during the trial. During the hearing on the motion to sever, the Defendant joined co-defendant Conde-Valentino's motion, noting that the only defendant who had made a statement to the police was co-defendant Tull-Morales.

At the hearing, counsel for co-defendant Conde-Valentino contended that the motion to sever was based upon *Bruton v. United States*, 391 U.S. 479 (1968) and Tennessee Rule of Criminal Procedure 14(c)(1). Counsel pointed out several statements as being problematic. The first statement identified by Counsel was made by co-defendant Tull-Morales during a phone conversation with Ms. Pinson that implicated the other defendants. Counsel conceded that the State had redacted the phone call to omit reference to the other defendants, which he said appeared to satisfy his *Bruton* claim.

Counsel for co-defendant Conde-Valentino then stated that Ms. Pinson's statement about watching the news with co-defendant Tull-Morales at which time he said that he committed this murder should be limited to the co-defendant implicating himself and not his co-defendants.

21

Counsel also took issue with Ms. Pinson's proposed testimony that the three co-defendants came to her home, planned the robbery, left her home, and returned bloody. He said that her statement attributed to co-defendant Tull-Morales that he and co-defendant Conde-Valentino went to the door of the victim's home and asked to use the bathroom violated *Bruton*. He pointed out that Ms. Pinson's statements that co-defendant Tull-Morales told her that he and co-defendant Conde-Valentino shot the victim also violated *Bruton*. Counsel said that the only way to afford his client his right to confrontation was to sever the cases for trial.

The State's attorney argued that it had adequately redacted the phone call. As to Ms. Pinson's other proposed testimony, the State expressed its belief that it could ensure that the State could properly limit Ms. Pinson's testimony. It agreed that if the State did not the defendants would have a right to a mistrial but that a pretrial severance was unnecessary. The State noted that Ms. Pinson could testify about what each individual said but not what one individual said about what another individual did.

The trial court reserved ruling on the motion, saying that it wanted to hear from Ms. Pinson before so doing. At the next pretrial hearing, the parties noted that the State intended to call Mr. Jobe, and upon hearing that, the defendants filed another motion to sever based upon his proposed testimony. Mr. Jobe testified at the hearing, and his testimony comported with is trial testimony detailed above.

The trial court ultimately denied the motions to sever.

## 2. Waiver

On appeal, the Defendant contends that several statements made during the trial violated *Bruton*. He takes issue with Ms. Pinson's testimony, which he quotes in detail, and argues that in her testimony she offers statements of the co-defendants implicating the Defendant. He further asserts that the testimony would have been inadmissible if the Defendant was tried separately.

The State contends that the Defendant waived this issue by not raising a contemporaneous objection and by failing to raise it in his motion for new trial. *See* Tenn. R. Evid. 103; Tenn. R. App. P. 3(e). Importantly, none of the defendants raised a contemporaneous objection. Tennessee Rule of Evidence 103(a)(1) requires "a timely objection . . ., stating the specific ground of objection if the specific ground was not apparent from the context." *See* Tenn. R. App. P. 3(e) ("[N]o issue presented for review shall be predicated upon error in the . . . jury instructions granted or refused ... unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."); Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as

22

requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). We note, however, that prior to the trial the parties had discussed limiting Ms. Pinson's testimony because of potential *Bruton* issues, and the State had assured the trial court that it believed that it could successfully prepare Ms. Pinson in this regard. The State attempted to elicit testimony narrowly, but the witness deviated in some of her responses. Further, while his issue was not as artfully crafted in his motion for new trial, the motion still addresses Ms. Pinson's testimony. We decline to treat the Defendant's issue as waived. *See* Tenn. R. Evid. 103(a) ( "Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal.").

### 3. *Bruton*

The Defendant cites to three specific instances during Ms. Pinson's testimony that he states raise *Bruton* issues. The Defendant describes the first instance as being in response to the State's questioning. He notes that the prosecution asked Ms. Pinson "[a]gain I need to limit what he said to you to just what . . . [co-defendant] Conde-Valentino did or had been up to that day, with that in mind what did he say?" Ms. Pinson then replied that:

> "[h]e said he walked in – he walked up the stairs, knocked on the door and was let in and he said, uh, he ran around the couch and he was stabbed, I don't remember if he said [the Defendant] or him did it, but he said that he stabbed him and he said he unloaded on him."

As a second example, the Defendant notes that, when the State asked "[i]t had already happened. So any argument was about the divvying up share?", Ms. Pinson responded, "Yes, [co-defendant Tull-Morales] said that . . . he didn't get what he deserved, you know, it was supposed to be split up three ways."

In his third and final example, the Defendant notes that the State asked Ms. Pinson about what statements co-defendant Tull-Morales had made about what he had done. Ms. Pinson responded,

> "He told me that he waited in the car for a really long time and then he told me that he went up the stairs and knocked on the door and said that he had to go to the bathroom. He was let in and he said that the couch was sitting this way and he said he walked past him and got his attention and he shot him. He said he blew his face off."

23

The Defendant states that these three statements violate *Bruton*. He further asserts that they do not fall within the hearsay exception regarding conspiratorial statements. Finally, the Defendant contends that this error is not harmless beyond a reasonable doubt.

The law on a motion for severance includes that "[t]he grant or denial of a motion for severance of defendants is a matter that rests within the sound discretion of the trial court, and [the reviewing court] will not disturb the trial court's ruling absent clear abuse of that discretion." *State v. Dotson*, 254 S.W.3d 378, 390 (Tenn. 2008) (citing *Hunter v. State*, 440 S.W.2d 1, 6 (Tenn. 1969); *State v. Burton*, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988)). "The test is whether or not the defendant was clearly prejudiced in his defense by being jointly tried with his codefendant." *State v. Howell*, 34 S.W.3d 484, 491 (Tenn. Crim. App. 2000) (citing *State v. Wiseman*, 643 S.W.2d 354 (Tenn. Crim. App. 1982)); *see also Dotson*, 254 S.W.3d at 390 ("The test to be applied . . . in determining whether the trial court abused its discretion is whether the [d]efendant was 'clearly prejudiced.'" (quoting *Hunter*, 440 S.W.2d at 6)). "The record must demonstrate that 'the defendant was clearly prejudiced to the point that the trial court's discretion ended and the granting of [a] severance became a judicial duty' before an accused is entitled to a reversal of his conviction." *Burton*, 751 S.W.2d at 447 (quoting *Hunter*, 440 S.W.2d at 6); *see also State v. Price*, 46 S.W.3d 785, 803 (Tenn. Crim. App. 2000).

Rule 8 of the Tennessee Rules of Criminal Procedure provides that "[a]n indictment, presentment, or information may charge two or more defendants . . . if each of the defendants is charged with accountability for each offense included." Tenn. R. Crim. P. 8(c)(1). If the defendant bases his motion for severance upon a co-defendant's out-of-court statement that "makes reference to the defendant but is not admissible against the defendant," the trial court must first determine if the State plans to offer the statement into evidence at trial. Tenn. R. Crim. P. 14(c)(1). If the State does so intend, it must choose one of the following:

(A) a joint trial at which the statement is not admitted in evidence or at which, if admitted, the statement would not constitute error;

(B) a joint trial at which the statement is admitted in evidence only after all references to the moving defendant have been deleted and if the redacted confession will not prejudice the moving defendant; or

(C) severance of the moving defendant.

*Id.* A defendant may also seek severance on the basis that it is necessary "to promote a fair determination of the guilt or innocence of one or more defendants." Tenn. R. Crim. P. 14(c)(2)(A).

In *Bruton v. United States*, the Supreme Court held that admission of a statement of a non-testifying co-defendant that incriminates the complaining defendant violates the complaining defendant's constitutional right of confrontation. *Bruton*, 391 U.S. at 126; *see* U.S. Const. amend. VI; Tenn. Const. art. 1, § 9; *Smart v. State*, 544 S.W.2d 109, 111-12 (Tenn. Crim. App. 1976). The *Bruton* rule should only be applied when the non-testifying co-defendant's statement constitutes 'a significant portion of the evidence of guilt,' and . . . if 'ample evidence was available to demonstrate [the defendant's] guilt without reliance upon his co-defendant's confession,' the violation would be considered harmless error." *State v. Ogle*, 666 S.W.2d 58, 60 (Tenn. 1984). If "the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison[,]" then the improper use of the admission is harmless beyond a reasonable doubt. *Schneble,* 405 U .S. at 430; *see Elliot,* 524 S.W.2d at 478. Reversal is not required unless it is proven beyond a reasonable doubt that the error complained of contributed to the verdict. *Chapman v. California,* 386 U.S. 18, 24 (1967); *see also State v. Lonta Montrell Burress, Jr., and Darius Jerel Gustus*, No. E2013-01697-CCA-R3CD, 2014 WL 6855226, at *16 (Tenn. Crim. App., at Knoxville, Dec. 4, 2014), *no Tenn. R. App. P. 11 application filed*.

The record shows that the three comments complained about by the Defendant were in response to the State's questioning but that the State did not intentionally elicit these responses. In the first instance, Ms. Pinson stated that she could not remember whether co-defendant Conde-Valentino said that he shot the victim or if he said that the Defendant shot the victim. In the second example, Ms. Pinson said that co-defendant Tull-Morales told her that the proceeds of the robbery were supposed to be split three ways. In the third and final example offered by the Defendant, Ms. Pinson said that co-defendant Tull-Morales told her that he waited in the car for a long time, walked up the stairs to the victim's home, said he had to use the restroom, and shot the victim.

We can quickly dismiss the Defendant's complaint raised as to the third example of a *Bruton* violation. The testimony of Ms. Pinson does not qualify pursuant to *Bruton* as it does not implicate the Defendant in any way. This Court has previously declined to apply *Bruton* to an accomplice's confession when it did not incriminate the defendant. *See Dorsey v. State*, 568 S.W.2d 639, 642 (Tenn. Crim. App. 1978) (holding that [p]ost-Bruton cases, as well as the ABA Standards, make it clear, that the rule in *Bruton* does not apply to confessions which do not implicate the non-confessing defendant . . . ."); *State v. Thomas J. Faulkner*, No. E2000-00309-CCA-R3-CD, 2001 WL 378540, at *10-

11 (Tenn. Crim. App., at Knoxville, Apr. 17, 2001), *perm. app. denied* (Tenn. Sept. 10, 2001).

We also decline to accept the Defendant's argument that Ms. Pinson's statement regarding the division of the proceeds of the robbery violated *Bruton*. *Bruton* does not bar the admission of a co-conspirator's statement made in furtherance of the conspiracy. *See State v. Crabtree*, 655 S.W.2d 173, 178 (Tenn. Crim. App. 1983), *superseded by statute on other grounds as stated in State v. Walker*, 910 S.W.2d 381, 385 (Tenn. 1995). Such a statement is admissible hearsay and would, therefore, be admissible if the defendant were tried separately. *See* Tenn. R. Evid 801(1.2)(E).

The issue then is whether co-defendant Tull-Morales statement of dissatisfaction with the distribution of the proceeds of the robbery falls within the hearsay exception regarding statements of co-conspirators. *See* Tenn. R. Evid. 803(1.2)(E). The Defendant contends that they were statements made in "casual conversation" and not in furtherance of any conspiracy. The State disagrees. Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is not admissible in evidence except as provided by exceptions in the Tennessee Rules of Evidence or other applicable law. *See* Tenn. R. Evid. 802. One of the exceptions to the hearsay rule is a statement of a co-conspirator. *See* Tenn. R. Evid. 803(1.2)(E). Under this exception, hearsay is admissible if it constitutes "a statement by a co-conspirator of a party during the course of and in furtherance of the conspiracy." *Id.*

A conspiracy is defined as a combination between two or more persons to do a criminal or unlawful act or a lawful act by criminal or unlawful means. *See State v. Alley*, 968 S.W.2d 314, 316 (Tenn. Crim. App. 1997). To be admissible under the co-conspirator hearsay exception, a statement must be made "during the course of" a conspiracy. This means that the conspiracy must have been occurring or ongoing at the time the statement was made. *See State v. Walker*, 910 S.W.2d 381, 385 (Tenn. 1995); *Gaylor*, 862 S.W.2d at 554; NEIL COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 803 (1.2)(6) (3d ed. 1995). If the conspiracy had not begun or had already concluded when the statement was made, the statement will not be admissible under the co-conspirator exception. *Id.* The exception also requires that the statement be "in furtherance of" the conspiracy. In short, the statement must be one that will advance or aid the conspiracy in some way. *See State v. Heflin*, 15 S.W.3d 519, 523 (Tenn. Crim. App. 1999). Commentators have explained that:

> [a] statement may be in furtherance of the conspiracy in countless ways. Examples include statements designed to get the scheme started, develop plans, arrange for things to be done to accomplish the goal, update

26

other conspirators on the progress, deal with arising problems, and provide information relevant to the project. While such statements are ordinarily made to other conspirators, Rule 803(1.2)(E) does not so require. Statements to third parties may qualify if in furtherance of the conspiracy.

Tennessee Law of Evidence, § 803(1.2). 6, p. 522.

Casual conversation between or among co-conspirators is not considered to be in furtherance of the conspiracy. *See Hutchison*, 898 S.W.2d at 170. Federal case law holds, and we agree, that casual conversation between or among co-conspirators should not necessarily have been deemed to have occurred "in furtherance of" the conspiracy. *State v. Hutchison*, 898 S.W.2d 161, 170 (Tenn. 1994).

We conclude that co-defendant Tull-Morales's statements, as recounted by Ms. Pinson, regarding the unfair division of the proceeds of the robbery, which the parties then rectified was in furtherance of the conspiracy. The men colluded before this murder and discussed killing or robbing the victim. They then left Ms. Pinson's apartment, armed with weapons, and drove to the victim's home where they entered, robbed, shot, and killed him. As a result of their robbery, they obtained money and drugs that they then split. They returned to Ms. Pinson's home, each man having blood on him, and argued about the distribution of the proceeds. The Defendant told Ms. Pinson to say nothing about what had happened. The men washed themselves of the blood and at least two of them used some of the drugs they obtained during the robbery. The statements made about the proceeds occurred while the three defendants were cleaning themselves from committing the crime, discussing the proceeds, and ensuring that witnesses remained silent. The conspiracy was ongoing at the time the statements were made, and the statement's admission did not violate *Bruton*.

We agree with the Defendant that his final example offered, that Ms. Pinson testified that she could not remember whether co-defendant Conde-Valentino said he or the Defendant stabbed the victim, violates *Bruton*. This is a statement made by a co-defendant potentially implicating the Defendant. *See Bruton*, 391 U.S. at 126. The issue then becomes whether this statement is harmless. As previously stated, the *Bruton* rule should only be applied when the non-testifying co-defendant's statement constitutes 'a significant portion of the evidence of guilt,' and . . . if 'ample evidence was available to demonstrate [the defendant's] guilt without reliance upon his co-defendant's confession,' the violation would be considered harmless error." *Ogle*, 666 S.W.2d at 60. If "the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison[,]" then the improper use of the admission is harmless beyond a reasonable doubt. *Schneble*, 405 U .S. at 430; *see Elliot*, 524 S.W.2d at 478. Reversal is not required unless it is proven beyond a

reasonable doubt that the error complained of contributed to the verdict. *Chapman,* 386 U.S. at 24967); *Burress*, 2014 WL 6855226, at \*16.

In the case under submission, we conclude reversal is not required. Ms. Pinson's statement that she could not recall whether co-defendant Conde-Valentino said that he or the Defendant stabbed the victim constituted an insignificant portion of the evidence of the Defendant's guilt. The evidence showed first that the victim was not stabbed but that he was shot six times. It also showed that the Defendant told Mr. Jobe that he intended to rob the victim and that Mr. Jobe attempted to stop him. The Defendant then went to Ms. Pinson's apartment and met his two co-defendants. The three decided to rob the victim, and the Defendant and two co-defendants left Ms. Pinson's home in the Defendants' vehicle with the Defendant driving and the Defendant and co-defendant Conde-Valentino were armed with guns. The Defendant's phone placed him in the location of the murder at the time of the murder, and the surveillance video of a nearby restaurant showed that a car matching the description of the car driven by the Defendant's car was near the victim's home at the time of the murder. After the murder, the Defendant, who had blood smeared on his hands, went to Ms. Pinson's house where he washed up and told her to "keep [her] mouth shut about what had happened." The following day, the Defendant contacted Mr. Jobe, told him the victim "might be dead" because the robbery "went wrong," and Mr. Jobe saw the Defendant dispose of his weapon. The Defendant asked Mr. Jobe to say that the Defendant was working for Mr. Jobe at the time of the murder, and Mr. Jobe declined. A few days later, the Defendant contacted Mr. Jobe and told him that he might have to kill co-defendant Tull-Morales because he believed that he had said something about the crime. Mr. Jobe encouraged him not to and suggested that he send co-defendant Tull-Morales to another location. Thereafter, Ms. Pinson saw co-defendant Tull-Morales get in to the SUV to leave his home and travel to Florida. In the face of this evidence, we conclude that the Defendant has not shown beyond a reasonable doubt that the error complained of contributed to the verdict. He is not entitled to relief on this issue.

## B. Jury Instruction Regarding Out of Court Statements

The Defendant next contends that the trial court erred when it failed to instruct the jury about his co-defendant's out of court statements, which he asserts was a required instruction. The State counters that the Defendant has waived review of this issue because he failed to request any such jury instruction or to object to the omission of the instruction. The State correctly notes that the Defendant did not file a written request for this instruction or verbally ask for the instruction at the time that the trial court discussed proposed jury instructions and did not object to the omission of the instruction.

28

A trial court has the duty to fully instruct the jury on the general principles of law relevant to the issues raised by the evidence. *See State v. Burns*, 6 S.W.3d 453, 464 (Tenn. 1999); *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *State v. Elder*, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998). Nothing short of a "'clear and distinct exposition of the law'" satisfies a defendant's constitutional right to trial by jury. *State v. Phipps*, 883 S.W.2d 138, 150 (Tenn. Crim. App. 1994) (quoting *State v. McAfee*, 737 S.W.2d 304 (Tenn. Crim. App. 1987)). In other words, the trial court must instruct the jury on those principles closely and openly connected with the facts before the court, which are necessary for the jury's understanding of the case. *Elder*, 982 S.W.2d at 876. Because questions regarding the propriety of jury instructions are mixed questions of law and fact, our standard of review here is *de novo*, with no presumption of correctness. *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

We conclude that the Defendant has waived full appellate review of this issue because the Defendant failed to file a written request for such a special jury instruction. *See* Tenn. R. Crim. P. 30(a); *Leath*, 461 S.W.3d 73, 107 (Tenn. Crim. App. 2013) (citing *State v. Mackey*, 638 S.W.2d 830, 836 (Tenn. Crim. App. 1982) (stating that Rule 30 "envisions that such requests be made in writing" and that oral requests for instructions are not sufficient for an appellate court to place a trial court in error for rejecting a requested jury instruction)). Failure to submit a special request in writing constitutes a waiver of the issue. *See State v. Vickers*, 985 S.W.2d 1, 8 (Tenn. Crim. App. 1997); *State v. Brewer*, 932 S.W.2d 1, 15 (Tenn. Crim. App. 1996). The issue is still reviewable for plain error. *State v. Page*, 184 S.W.3d 223, 230 (Tenn. 2006).

In determining whether plain error review is appropriate, the following factors must be established:

(a) the record . . . clearly establish[es] what occurred in the trial court;

(b) a clear and unequivocal rule of law [has] been breached;

(c) a substantial right of the accused [has] been adversely affected;

(d) the accused did not waive the issue for tactical reasons; and

(e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). On appeal, the defendant has the burden of establishing that these five factors are met. *State v. Gomez*, 239 S.W.3d 733, 737 (Tenn.

2007) (citing *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007)). The appellate court need not consider all five factors if any single factor indicates that relief is not warranted. *Smith*, 24 S.W.3d at 283.

We conclude that this issue does not require plain error review because consideration of this issue is not necessary to do substantial justice. As stated above, the only issue that violated *Bruton* was the statement testified to by Ms. Pinson when she said that she could not recall whether co-defendant Conde-Valentino said that he or the Defendant stabbed the victim. As articulated above this was not a great portion of the evidence against the Defendant. Further, there was proof that the victim was not, in fact, stabbed. The Defendant is not entitled to relief on this issue.

### C. Sufficiency of Evidence

The Defendant finally contends that the evidence is insufficient to sustain his convictions noting that there was no evidence that he or his co-defendants knowingly obtained or exercised control over the victim's property. The State counters that the evidence is sufficient to sustain the Defendant's convictions. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted).

"The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*,

286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

First degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnaping, aggravated child abuse, aggravated child neglect or aircraft piracy . . . ." T.C.A. § 39-13-202(a)(2) (2014). "No culpable mental state is required for conviction under subdivision (a)(2) . . . except the intent to commit the enumerated offenses or acts in such subdivisions." T.C.A. § 39-13-202(b). A conviction for especially aggravated robbery, as relevant to this case, requires proof beyond a reasonable doubt that a defendant committed an "intentional or knowing theft of property from the person of another by violence or putting the person in fear" with the use of a deadly weapon and the victim suffered serious bodily injury. T.C.A. §§ 39-13-401(a), -403 (2014). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103 (2014).

A defendant is criminally responsible as a party to an offence if the offense is omitted by the defendant's own conduct, by the conduct of another for which the defendant is criminally responsible, or by both. T.C.A. § 39-11-401(a). One way to establish criminal responsibility is to prove the accused, while acting with the intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, solicited, directed, aided, or attempted to aid another person in committing the offense. T.C.A. § 39-11-402(2). Criminal responsibility is not a separate or distinct crime. *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). A defendant convicted by the theory of criminal responsibility is guilty in the same degree as the principal who committed the crime and is considered to be a principal offender. *Id.* at 171.

In the case under submission, before this murder, the Defendant told Mr. Jobe that he intended to rob the victim by creating a false drug deal. He went to the housing project where the two co-defendants lived and there the three discussed robbing the victim. The Defendant left Ms. Pinson's home, armed with a weapon, and drove his two co-defendants to the victim's home. He went into the home and was present while the victim was shot six times. Co-defendant Conde-Valentino's blood was found in the victim's home. The Defendant returned to Ms. Pinson's home with blood on his hands. There the parties discussed the division of proceeds, and the Defendant told Ms. Pinson not to say anything about the offense. The Defendant, while with Mr. Jobe the following day, disposed of his weapon and asked Mr. Jobe to provide him an alibi. The Defendant expressed his intention to kill co-defendant Tull-Morales to ensure that he did not tell anyone about the crime. Upon Mr. Jobe's suggestion, he assisted co-defendant Tull-Morales in leaving the area. We conclude that this evidence is sufficient to sustain the Defendant's convictions for especially aggravated robbery and first degree felony murder. He is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the Defendant is not entitled to relief. Accordingly, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE